**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MARSHA M. WHITE,**

        **Plaintiff,**

    **v.**                         **Civil Action 2:15-cv-2091**
                                        **Magistrate Judge Kimberly A. Jolson**

**TYRONE REYNOLDS, et al.,**

        **Defendants.**

## OPINION AND ORDER

        This matter is before the Court on Defendant Ohio Department of Public Safety's motion for summary judgment. (Doc. 27). For the reasons that follow, the motion is **GRANTED**.

## I. BACKGROUND

### A. Factual Background

        Plaintiff Marsha White, an African-American woman, has been an employee of the Ohio Department of Public Safety ("Defendant" or "DPS") for over 20 years. (Doc. 26 at 8, PAGEID #: 429). Relevant to this lawsuit, Plaintiff was a member of Defendant's Administrative License Suspension Points Unit ("ALS Points") in November of 2012. Plaintiff claims that around that time, two of her co-workers, Brittany Matthews and Cherelle Evans, were gossiping that Plaintiff was stalking Evans on Facebook. (*Id.* at 13, PAGEID #: 434). Plaintiff reported the rumors to her supervisor, Nancy Dixon, and Dixon relocated Plaintiff away from the two women in January of 2013. (*Id.* at 13–16, PAGEID #: 434–37).

        But Plaintiff's troubles with Matthews and Evans continued (*id.* at 17, PAGEID #: 438), and because Plaintiff was dissatisfied with Dixon's reactions to her complaints, Plaintiff went up the chain of command—first to Dianna McConnaughey, Dixon's supervisor, and then to Pam Caldwell, the president of Plaintiff's union, the Ohio Civil Service Employees Association

("OCSEA") (*see id.* at 22, PAGEID #: 443). On April 26, 2013, Plaintiff and Caldwell met with Tyrone Reynolds, a DPS labor relations officer. (*See id.*; Doc. 20-2 at 8, PAGEID #: 218). During the meeting, Plaintiff verbally requested a transfer from the ALS Points Unit to any unit out of the building and preferably to the Bureau of Motor Vehicles location at Alum Creek Drive. (Doc. 26 at 23–24, PAGEID #: 444–45).

The collective bargaining agreement ("CBA") between OCSEA and DPS governs Defendant's employee-transfer process. (*Id.* ¶¶ 6–10). At all times relevant to the lawsuit, Plaintiff held the job classification of Customer Service Assistant II ("CSA II"). (Doc. 26 at 25, PAGEID #: 446). For Plaintiff to move to another CSA II position, she would have had to do so via the lateral-transfer process outlined in the CBA. (*See id.*). The CBA requires employees seeking a lateral transfer—"an employee-requested movement to a posted vacancy within the same Agency" (Doc. 27-1 at 9, PAGEID #: 797 (Ex. A ¶ 17.02(F))—to submit a written application. (*Id.* at 10, PAGEID #: 798 (Ex. A ¶ 17.04)). Plaintiff requested a transfer only verbally and never submitted an official application in writing to transfer to any openings within the department. (*Id.* ¶¶ 6–11). According to his declaration, Reynolds therefore considered Plaintiff's verbal transfer request during the April 26, 2013 meeting to be "informal." (*Id.*).

On May 20, 2013, Plaintiff's verbal transfer request was denied. In an email to Caldwell, Reynolds explained that he would not "be able to make any moves at the present time" "[g]iven that a number of CSA 2 positions have recently been posted, along with the fact that I have four requests from individuals in the CSA classification to be moved to new positions." (Doc. 26-1 at 26, PAGEID #: 697 (Ex. 5)). In her deposition, Plaintiff testified that three people—all of whom are white—received transfers around the same time: Kathy Ryder in February of 2013, Michelle Burris in May of 2013, and Linda Smith in May of 2014. (Doc. 26 at 26, PAGEID #: 447).

Ryder held the job classification of CSA II and "was reassigned to another work unit due to a lack of work in the recently constituted work unit—Safe ID—for which the anticipated volume of work had not materialized." (Doc. 27-1 ¶ 17). Burris held the classification of CSA II in the Telecommunications Unit and was reassigned "because a court had issued a domestic violence civil protection order prohibiting Burris's husband—who also worked at DPS's main location at 1970 W. Broad Street in Columbus—from being within 100 feet." (*Id.* ¶ 16). Smith held the classification of Administrative Professional II and was reassigned because of "work performance problems." (*Id.* ¶ 18).

On July 25, 2013, Evans and Matthews each sent an email to McConnaughey regarding an incident with Plaintiff. Both reported that Plaintiff threatened them, saying "it won't be so funny soon." (Doc. 26-1 at 32, 33, PAGEID #: 703, 704). Plaintiff denies their allegations. (Doc. 26 at 39, PAGEID #: 460). On August 8, 2013, Plaintiff emailed Dixon complaining that Matthews, accompanied by Evans, walked past Plaintiff's desk and "made a statement [that] someone should be worried." (Doc. 26-1 at 35, PAGEID #: 706). Although Defendant investigated both incidents, the allegations could not be substantiated and, as a result, no one was disciplined. (*See, e.g.*, Doc. 27-1 ¶¶ 20–21).

On August 5, 2013, Plaintiff received an email from Krysten McElfresh, a DPS labor relations officer, offering Plaintiff a spot in the Telecommunications Unit of the Bureau of Motor Vehicles. (Doc. 26 at 50, PAGEID #: 471; Doc. 20-4 at 1, PAGEID #: 230). Plaintiff declined the offer via email on August 8, 2013. (Doc. 26 at 50, PAGEID #: 471; Doc. 20-4 at 1, PAGEID #: 230). Plaintiff testified that she rejected the opportunity because she saw it as a demotion and "felt that [the Telecommunications] department was a hostile department." (Doc. 26 at 51, PAGEID #: 472). Plaintiff further explained: "I've had encounters down there, and a lot of

employees, especially Afro-Americans have transferred and t[aken] themselves out of the department. And through hearsay, and what I understand, they have a lot of complaints about Kim Ross," Chief of the Telecommunications Unit, "and her treatment of Afro-Americans down there." (*Id.*).

On September 25, 2013, Matthews filed a petition against Plaintiff in the Franklin County Court of Common Pleas for a civil stalking protective order. (*See id.* at 103–05, PAGEID #: 524–26). Because Matthews did not reside in Franklin County, Judge Richard Sheward dismissed the case for lack of jurisdiction. (Doc. 26-1 at 46, PAGEID #: 717). The petition and the dismissal were sent to Plaintiff at work via certified mail. (Doc. 26 at 103–04, PAGEID #: 524–25). Plaintiff took exception to DPS's legal department opening the letter, believing that the legal department opened the letter in retaliation for Plaintiff's prior EEOC charges of discrimination. (*See id.* at 104–10, PAGEID #: 525–31; *id.* at 109–10, PAGEID #: 530–31). Plaintiff admits she has no evidence to support her belief. (*Id.* at 110, PAGEID #: 531). And McConnaughey informed Plaintiff that "[i]t is ODPS policy to open any and all certified mail regardless of who it is addressed to in order to determine the nature of the correspondence and proper routing." (Doc. 20-9 at 2, PAGEID #: 247).

Shortly thereafter, DPS further separated Plaintiff, Matthews, and Evans. Matthews was reassigned to the Special Case Unit. (Doc. 27-1 ¶ 6). And Plaintiff, per Article 17.01 of the OCSEA CBA, was reassigned to the Telecommunications Unit. (*Id.*). Plaintiff views the reassignment as a "downgrade." (Doc. 26 at 40, PAGEID #: 114). She testified that, as a member of the ALS Points Unit, she "opened and closed cases," "suspended driver's licenses," "talked to attorneys," and had "more of a detailed job." (*Id.* at 41, PAGEID #: 462). She described the Telecommunications Unit as one where "you strictly take phone calls all day

long."  (*Id.*).  Plaintiff did not lose any status in pay, benefits, or job classification with the transfer.  (*Id.* at 41–42, 115–16, PAGEID #: 461–62, 536–37).

On December 18, 2013, Plaintiff filed a charge with the EEOC alleging race discrimination under Title VII and age discrimination under the Age Discrimination in Employment Act ("ADEA").  (Doc. 26-1 at 12, 14, PAGEID #: 683, 685).  She based her charge on the denial of her informal transfer request and on the transfers of Burris and Ryder.  (*Id.* at 14, PAGEID #: 685).  On February 4, 2014, Plaintiff filed another discrimination charge with the EEOC regarding her transfer from the ALS Points Unit to the Telecommunications Unit.  (*Id.* at 18, PAGEID #: 689).  Plaintiff checked the box for "retaliation" and then wrote that she had "been discriminated against for participating in a protected activity" in violation of Title VII and the ADEA.  (*Id.*).

Plaintiff's satisfaction at work did not improve after her transfer to the Telecommunications Unit.  On February 24, 2014, Plaintiff met with Ross, the Telecommunications Chief, and Gen Reid, Plaintiff's supervisor at that time, "to discuss the necessity to adjust [Plaintiff's] current work schedule due staffing levels and operational needs." (Doc. 26 at 120, PAGEID #: 541).  Prior to changing departments, Plaintiff worked from 8:15 a.m. to 5:00 p.m.  (*Id.* at 119, PAGEID #: 540).  On March 6, 2014, Plaintiff signed a "Mandatory Work Schedule Change" acknowledging that the meeting took place and, from a list of five options for a schedule adjustment, choosing to switch her work schedule to 9:00 a.m. to 5:45 p.m.  (Doc. 26-1 at 63, PAGEID #: 734).  Beneath her signature, Plaintiff wrote: "I do not understand all verbiage of this document pertaining to agreements made in accordance with OCSEA contract.  I was placed in this department per Article 17.01 OCSEA contract and agreement was clearly made on Oct[.] 28, 2013.  Nothing in Article 17.01 states shift change."

(*Id.*).  Plaintiff testified that, on April 8, 2015, Ross allowed "a young white female and two white males" to work during Plaintiff's previous hours of 8:15 a.m. to 5:00 p.m.  (Doc. 26 at 123, PAGEID #: 544).  Plaintiff could not recall the names of the three people—she "want[ed] to say Chad [Felver] was one," she "th[ought] Kayleigh Barker was one," and she thought the other one "might have been [someone named] Chris."  (*Id.*).

On March 23, 2015, according to Plaintiff's testimony, Reid yelled at Plaintiff in front of other employees regarding Plaintiff's leave time under the Family and Medical Leave Act ("FMLA").  (*Id.* at 47, PAGEID #: 468).  After the altercation, according to Plaintiff, "[t]he union then got involved, a grievance was filed, [and] a settlement was made for workplace violence and supervisor intimidation."  (*Id.*).  Plaintiff also filed an EEOC charge following the incident but had not received a right-to-sue letter as of her deposition on January 13, 2016.  (*Id.* at 45–46, PAGEID #: 466–67).

In April of 2015, Felver, who was the Telecommunications Unit Assistant Chief, offered Plaintiff the opportunity to work on what the parties call "the DX line," scheduling tests for people to obtain their driver's licenses.  (*See id.* at 42–43, PAGEID #: 463–44).  When Felver offered Plaintiff the job, Deborah Lindsay-Thigpen was the supervisor of the Telecommunications Unit.  A short while later, Reid became the supervisor of the Unit.  (*Id.* at 47, PAGEID #: 468).  On April 24, 2015, Plaintiff told Felver that she did "not want to be under Gen Reid due to her harassment and [the] grievance filed for her actions on March 23, 2015." (Doc. 26-1 at 34, PAGEID #: 705).  Felver responded that Plaintiff should still be trained "on the operation of the DX line since there is a small possibility you may have to take these calls as part of your job.  Before we move forward with a different volunteer, would you like to be trained before you pass on the full time DX scheduling?  Please let me know on Monday."  (*Id.*).

The parties disagree as to whether Plaintiff received training on the DX line.  In an email on August 31, 2015, Lindsay-Thigpen told Plaintiff that, based on her "activity sheet," she was "trained on the DX Scheduling line on August 14, 2014." (Doc. 26-1 at 65, PAGEID #: 736; *see* Doc. 26 at 127, PAGEID #: 548).  At her deposition, Plaintiff testified that she had not received a full training on the DX line.  (*See, e.g.*, Doc. 26 at 126–28, PAGEID #: 547–49).  She testified further that she was offered only a "refresher" course on the DX line.  (*See id.* at 127–28, PAGEID #: 548–49).  DX training does not provide employees with a pay increase or additional benefits.  (*Id.* at 128, PAGEID #: 549).  But Plaintiff believes that having the DX training would be "something that I can put on my resume to say this is something else I know how to do. If I want to apply for a job, I could say I know I've done this, I've done this type of work." (*Id.*).  Plaintiff testified that she felt like she "struggled a little bit" on the DX line but that she has not had any performance issues otherwise related to her performance on the DX line.  (*Id.* at 129, PAGEID #: 550).

In the spring and summer of 2015, Plaintiff clashed with DPS leadership regarding leave time.  On April 14, 2015, Plaintiff was issued a written reprimand for taking 15 minutes of leave time beyond what she had available in FMLA time and any other available leave time.  (Doc. 27-1 ¶ 25; *see id.* at 36–40, PAGEID #: 824–28).  And, on June 19, 2015, Plaintiff was issued a three-day working suspension with pay for exceeding her available FMLA and other leave time by eight hours.  (*Id.* ¶ 26; *see id.* at 41–49, PAGEID #: 829–37).  Plaintiff's union filed a grievance over the suspension.  The grievance was settled, reducing Plaintiff's discipline to a one-day working suspension with pay.  (*Id.* ¶ 27; *see id.* at 50–51, PAGEID #: 838–39).  Later in June of 2015, Plaintiff was reassigned to a new supervisor, Lindsay-Thigpen, given her problems with Reid.  (Doc. 26 at 136, PAGEID #: 557).

On August 24, 2015, Plaintiff received corrective counseling from Lindsay-Thigpen.  A letter memorializing the counseling states that Lindsay-Thigpen received a phone call from a customer who claimed that Plaintiff would not answer his question about having his elderly mother's driver's license revoked, became argumentative with him, and hung up on him.  (*See* Doc. 26-1 at 67, PAGEID #: 738).  The letter noted that Plaintiff was not being disciplined but that the incident would be documented as: "Failure to provide accurate information," "Becoming argumentative with a customer," and "Hanging up on a customer."  (*Id.*).  Next to her signature on the letter, Plaintiff wrote, "Do not agree no recording provided."  (*Id.*).

Finally, Plaintiff contends that, in September of 2015, Ross and Felver delivered Plaintiff's 25-year service pin to her desk in a brown envelope.  (Doc. 26 at 198, PAGEID #: 619).  Plaintiff testified in her deposition that this was "rude and disrespectful."  (*Id.*).  In an email on September 4, 2015, Ross told Plaintiff that her pin was delivered to Plaintiff's desk because Plaintiff failed to respond to a prior email asking how Plaintiff would like her pin delivered.  (Doc. 20-18 at 6–7, PAGEID #: 327–28).

## B. Procedural Background

On May 20, 2015, Plaintiff brought suit against Reynolds and DPS asserting "claims of race, sex, and age discrimination under Title VII, 42 U.S.C. § 2000e-5, and the Age Discrimination in Employment Act, 29 U.S.C. § 621."  (Doc. 19 at 1).  After the parties consented to the Magistrate Judge on August 19, 2015 (Doc. 9), Reynolds moved for judgment on the pleadings on September 4, 2015 (Doc. 11).  His motion was granted, and he was dismissed from the case on December 21, 2015.  (Doc. 19).  Plaintiff filed an amended complaint on January 7, 2016.  (Doc. 20).  She alleges race discrimination and retaliation for her EEOC

filings, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.[1] Defendant moved for summary judgment on April 15, 2016.  (Doc. 27).

## II.  STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see id.* at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970))).  A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (explaining that "genuine" amounts to more than "some metaphysical doubt as to the material facts").  Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

---

[1] In its motion for summary judgment, Defendant includes arguments pertaining to a possible harassment claim based on a racially hostile work environment.  The Court does not read Plaintiff's amended complaint to bring such a claim.  Moreover, Plaintiff's opposition to the motion for summary judgment does not mention a harassment claim.  If she did bring such a claim, she therefore waived it.  *See Surfield v. L.G. Phillips Displays USA, Inc.*, 115 F. App'x 818, 820 (6th Cir. 2004) ("Plaintiff waived his claim on severance benefits by not mentioning it in his memorandum in opposition to summary judgment.").

## III. DISCUSSION

### A. Race Discrimination

To establish a claim for race discrimination under Title VII, a plaintiff "must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003) (citation omitted). "[D]irect evidence is that evidence which, if believed, requires a conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005) (quotations omitted); *see Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) ("Evidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed."). Plaintiff admits that she has no evidence of "explicitly expressed" racial animus. *Id.*; (*see* Doc. 26 at 76, 84–86, 150, 162–63, PAGEID #: 497, 505–07, 571, 583–84). The Court therefore applies the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Under *McDonnell Douglas*, Plaintiff must first present a prima facie case of discrimination. To do so, she "must show (1) that [she] is a member of a protected group, (2) that [she] was subject to an adverse employment decision, (3) that [she] was qualified for the position, and (4) . . . that similarly situated non-protected employees were treated more favorably." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002). "Once the *prima facie* case is made, Defendant may offer any legitimate, non-discriminatory reason for the employment action, which Plaintiff may rebut by evidence of pretext; however, the burden of proof always remains with the plaintiff." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

Defendant contends that Plaintiff's claim for race discrimination fails because: (1) Plaintiff cannot meet the second and fourth prongs of her prima facie case; (2) Defendant offers legitimate, non-discriminatory reasons for each allegedly discriminatory action; and (3) Plaintiff has no evidence to show that Defendant's reasons were pretext for racial discrimination.

### 1. *Prima Facie Case*

As an initial matter, Plaintiff fails to articulate which the employment action qualifies as "adverse."  For its part, Defendant identifies eleven actions that potentially could be construed as adverse: (1) the refusal to reassign Plaintiff's work location to Alum Creek; (2) Plaintiff's lateral reassignment to the Telecommunications Unit in response to her issues with her co-workers; (3) the investigation into Plaintiff's alleged threats against her co-workers; (4) one of Plaintiff's co-workers filed a restraining order against her; (5) Defendant's legal department opened a certified letter addressed to Plaintiff regarding the restraining order; (6) Plaintiff did not receive her years-of-service pin in the manner she preferred; (7) Plaintiff's schedule change from 8:15 a.m. to 5:00 p.m. to 9:00 a.m. to 5:45 p.m.; (8) Plaintiff did not receive the additional DX training she wanted; (9) Plaintiff's non-disciplinary corrective counseling on August 24, 2015; (10) Plaintiff's written reprimand in April of 2015 for exceeding her leave time; and (11) Plaintiff's one-day suspension with pay in June of 2015 for exceeding her leave time.  (Doc. 27 at 8–18, PAGEID #: 759–69).  Plaintiff does not disagree that these are the alleged adverse actions upon which she bases her race discrimination claim and offers no others.

To satisfy the second prong of her prima facie case, Plaintiff must show that at least one of these actions amounts to "a materially adverse change in the terms and conditions" of her work.  *Foster v. Michigan*, 573 F. App'x 377, 394 (6th Cir. 2014).  Examples of actions that rises to this level "include termination of employment, a demotion . . . a less distinguished title, a

material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (quotations omitted). Plaintiff admits that, throughout the time at issue in this case, she was not given a less distinguished title, did not suffer a loss of benefits, was not demoted, and remained in the same job classification. (Doc. 26 at 16, 41–42, 116, 124, 147, PAGEID #: 437, 462–63, 536, 546, 568). Defendant therefore contends that none of these actions qualifies as materially adverse.

The only action that merits explanation is Plaintiff's reassignment to the Telecommunications Unit in October of 2013 to separate her from her co-workers. (*See id.* at 40). Plaintiff testified that she saw the reassignment as a "downgrade." (*Id.*). However, "a plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004). Additionally, "[t]ransfers intended to respond to and resolve an employee's problems with another employee do not constitute adverse employment action." *Kasprzak v. DaimlerChrysler Corp.*, 431 F. Supp. 2d 771, 777 (N.D. Ohio 2005). Plaintiff's acknowledgement that she did not lose any status in pay, benefits, or job classification further demonstrates that the transfer does not qualify as materially adverse. (*Id.* at 41–42, 115–16, PAGEID #: 461–62, 536–37); *see Timmons v. Boehringer Ingelheim Corp.*, 132 F. App'x 598, 600 (6th Cir. 2005) ("A transfer at no loss of title, pay or benefits does not amount to an adverse employment action.").

As for the remaining actions at issue, the Court agrees with Defendant—none is materially adverse under the law. *See, e.g.*, *Gainor v. Worthington City Sch.*, No. 2:11-cv-561, 2013 WL 6587869, at *9 (S.D. Ohio Dec. 13, 2013) (action (1): "An employer's decision to deny a lateral transfer, however, is not an adverse action unless it results in a material change of

salary, benefits, responsibilities, or prestige." (quotation omitted)); *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) (action (3): "internal investigation into suspected wrongdoing by an employee" not an adverse employment action); *Mlynczak v. Bodman*, 442 F.3d 1050, 1061 (7th Cir. 2006) ((4): private lawsuit by co-worker "not the kind of adverse action" that Title VII reaches; *Gage v. United States*, No. 1:05CV2902, 2008 WL 974044, at *6 (N.D. Ohio Apr. 7, 2008) ((5): supervisor reviewing confidential mail not an adverse employment action); *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) ((6): "Title VII, we have said, does not set forth a general civility code for the American workplace." (quotation omitted)); *Johnson v. United Parcel Serv.*, 117 F. App'x 444, 450 (6th Cir. 2004) ((7): "[A]bsent changes in salary or the number of hours of work, scheduling matters would not normally classify as potential adverse employment actions."); *Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 345 (6th Cir. 2008) ((8): "[Plaintiff's] own conclusory assertions as to the value of the training and her inability to receive promotions are insufficient to survive summary judgment."); *Handshoe v. Mercy Med. Ctr.*, 34 F. App'x 441, 447 (6th Cir. 2002) ((9): "counseling, documented in writing" not an adverse action); *Creggett v. Jefferson Cty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012) ((10): "A written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action."); *Rose v. Buckeye Telesystem, Inc.*, 181 F. Supp. 2d 772, 777 (N.D. Ohio 2001) ((11): "Plaintiff's one-day suspension with pay does not constitute an adverse employment action.").

Even if Plaintiff could demonstrate an adverse action, Defendant argues that she fails to put forth any evidence in support of the fourth prong—that any similarly situated non-protected employees were treated more favorably.  The Court agrees here as well.  Regarding her schedule

change, two of three alleged comparators—Felver and someone named "Chris"— were, unlike Plaintiff, supervisors and thus not similarly situated.  *See Rutherford v. Britthaven, Inc.*, 452 F. App'x 667, 672 (6th Cir. 2011) ("We have previously held supervisory and non-supervisory employees to not be similarly situated."); (*see* Doc. 26 at 122–24, PAGEID #: 543–545).  Barker, the third comparator, was promoted to supervisor as well.  (*See id.* at 124, PAGEID #: 545).

Regarding Defendant's failure to reassign her to Alum Creek, Plaintiff contends that, unlike Plaintiff, three white employees—Ryder, Smith, and Burris—were reassigned to their desired locations.  Smith, a secretary with a different job classification than Plaintiff (Doc. 27-1 ¶ 18), cannot be considered similarly situated.  *See Campbell v. Hamilton Cty.*, 23 F. App'x 318, 325 (6th Cir. 2001) ("Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated.").  The other two comparators, Ryder and Burris, were moved only temporarily and under entirely different circumstances.  (*See* Doc. 27-1 ¶ 16 (Burris reassigned temporarily due to restraining order against her husband); *id.* ¶ 17 (Ryder reassigned temporarily due to lack of work in her Unit)).  They too cannot be considered comparators.  *See Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) (plaintiff must show that "all relevant aspects" of employment situation are "nearly identical to those of the alleged similarly situated" (quotations omitted)).

For these reasons, Plaintiff fails to establish a prima facie case of race discrimination under Title VII, and her claim fails as a matter of law.

### 2. *Legitimate, Non-Discriminatory Reasons for the Alleged Adverse Actions*

Even if Plaintiff could establish her prima facie case, Defendant offers legitimate non-discriminatory reasons for each of the actions at issue.  It therefore has met its burden of production at this step of the *McDonnell Douglas* framework.  (*See, e.g.*, Doc. 27-1 ¶¶ 6, 7–9,

12–15 (action (1): Plaintiff not reassigned to Alum Creek because she did not go through formal application process required by the CBA and because no positions were available at that location); *id.* ¶¶ 19–24 (action (2): Plaintiff reassigned to Telecommunications Unit to resolve issues with co-workers); *id.* ¶ 20 ((3): Plaintiff investigated after two co-workers alleged that she threatened them); Doc. 20-9 at 2, PAGEID #: 247 ((5): McConnaughey telling Plaintiff that "[i]t is ODPS policy to open any and all certified mail regardless of who it is addressed to in order to determine the nature of the correspondence and proper routing"); Doc. 26 at 198–99, PAGEID #: 619–20 ((6): Defendant delivered Plaintiff's service pin to her desk after she declined to respond as to how she wanted to receive them); Doc. 20-18 at 6–7, PAGEID #: 327–28 ((6): Ross confirming the reason for delivering Plaintiff's service pin to her desk); Doc. 26 at 119–22 & Ex. 12, PAGEID #: 540–43 & 734 (7): Plaintiff's schedule adjusted to account for staffing levels and operational needs); *id.* at 133–35 & Ex. 13, PAGEID #: 554–56 & 736 ((8): Lindsay-Thigpen explaining that Plaintiff had been denied further DX training because she already had received DX training); *id.* at 201–02 & Ex. 14, PAGEID #: 622–23 & 738 ((9): Plaintiff receives corrective counseling for being rude to a customer); Doc. 27-1 ¶ 25 ((10): Plaintiff issued written reprimand after exceeding her leave time); *id.* ¶ 26 ((11): Plaintiff suspended with pay for exceeding her leave time by eight hours)).

### 3. *No Evidence of Pretext for Racial Discrimination*

For Plaintiff to prevail, she would next have to show that Defendant's proffered reasons are pretext for discrimination. *See, e.g.*, *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). "[A] plaintiff can establish pretext by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not *actually* motivate his [discipline], or (3) that they were insufficient to motivate discharge." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349

(6th Cir. 2012) (quotation omitted) (emphasis in original).  Plaintiff offers no evidence that Defendant's reasons were pretextual.  She therefore fails to meet her burden of production at step three of the framework, and, for this additional reason, her claim cannot survive summary judgment.  *See, e.g.*, *Gielda v. Bangor Twp. Sch.*, 505 F. App'x 550, 556–57 (6th Cir. 2012).

### 4.  Conclusion

In sum, Plaintiff fails to establish a prima facie claim for discrimination because she has not demonstrated that she was subject to an adverse employment decision and because she has not shown that similarly situated, non-protected employees were treated more favorably. Moreover, she has failed to rebut Defendant's legitimate, non-discriminatory reasons in support of the actions at issue.  Defendant's motion for summary judgment is thus granted as to Plaintiff's race discrimination claim under Title VII.

## B.  Retaliation

Plaintiff's remaining Title VII claim is for retaliation.  Because Plaintiff does not present direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework again applies. *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).  To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in a protected activity under Title VII, (2) the protected activity was known to Defendant, (3) Defendant took an adverse employment action against Plaintiff, and (4) there was a causal connection between the adverse employment action and the protected activity.  *See Taylor v. Geithner,* 703 F.3d 328, 336 (6th Cir. 2013).  If Plaintiff establishes a prima facie case, Defendant then has the burden of production to articulate legitimate, nondiscriminatory reasons for its actions.  *Fuhr v. Hazel Park Sch. Dist.,* 710 F.3d 668, 674 (6th Cir. 2013).  "If a defendant successfully produces such a legitimate reason, then the burden of production returns to the plaintiff to demonstrate by a

preponderance of the evidence that the proffered reason was a mere pretext for [retaliation]." *Id.* at 675; *see Univ. of Tex. Sw. Med. Ctr. v. Nassar,* __ U.S. __, 133 S. Ct. 2517, 2533 (2013) (holding that causation for Title VII retaliation claims "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer").

Defendant argues that Plaintiff fails to establish any elements of her prima facie claim, and that she cannot show that any of the actions were pretext for retaliation.  Filing charges with the EEOC is indeed protected under Title VII, and Plaintiff meets the first element of her prima facie case.  *See, e.g.*, *Tuttle v. Metro. Gov't of Nashville & Davidson Cty.*, 474 F.3d 307, 314 (6th Cir. 2007); *E.E.O.C. v. SunDance Rehab. Corp.*, 466 F.3d 490, 498 (6th Cir. 2006).  The Court, however, agrees with Defendant that Plaintiff cannot meet her prima facie case on each of the remaining prongs.

### 1. Actions Before Plaintiff's EEOC Charges

Plaintiff filed her EEOC charges in December of 2013 and February of 2014.  (Doc. 26-1 at 12, 14, PAGEID #: 683, 685; *id.* at 18, PAGEID #: 689).  Five of the alleged adverse actions took place before she filed her EEOC charges.  (Doc. 26-1 at 26 PAGEID #: 697 (Plaintiff's informal transfer request denied on May 20, 2016); Doc. 20-11 at 3, PAGEID #: 265 (Plaintiff reassigned to Telecommunications Unit on October 28, 2013); Doc. 26 at 18, PAGEID #: 439 (investigation into Plaintiff's alleged threats against her co-workers took place in February of 2013); *id.* at 103–05, PAGEID #: 524–26 (Matthews filed petition for protective order on September 25, 2013); Doc. 20-9 at 2, PAGEID #: 247 (DPS's legal department opened Plaintiff's mail in October of 2013)).  Her retaliation claim related to these actions therefore fails as a matter of law.  *See Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6th Cir. 2009)

("To maintain a claim for retaliation, [plaintiff] must establish that: (1) she engaged in Title VII-protected activity; (2) [Defendant] knew that she engaged in the protected activity; (3) [Defendant] *subsequently took an adverse employment action . . . .*" (emphasis added)); *Hudson v. M.S. Carriers, Inc.*, 335 F. Supp. 2d 853, 863 (W.D. Tenn. 2003).

### 2.  *Actions After Plaintiff's EEOC Charges*

#### a.  **Knowledge of Protected Activity**

Defendant argues that Plaintiff does not present any evidence that any of the decision makers behind the remaining actions at issue had knowledge of her EEOC charges.  Plaintiff does not respond to Defendant's argument in her opposition.  Because she fails to offer direct or circumstantial evidence regarding Defendant's knowledge of her protected activity, she cannot establish a prima facie case for retaliation under Title VII.  *See Derusha v. Detroit Jewish News & Style Magazine*, 132 F. App'x 629, 632 (6th Cir. 2005) ("Assuming it was protected activity, however, Plaintiff's claim still fails, because as the district court noted, Plaintiff did not provide any evidence that Horowitz had knowledge of Plaintiff's reluctance to sign the affidavit."); *Proffitt v. Metro. Gov't of Nashville & Davidson Cty.*, 150 F. App'x 439, 442 (6th Cir. 2005); *see also Sagan v. Sumner Cty. Bd. of Educ.*, 501 F. App'x 537, 540 (6th Cir. 2012) ("The district court has no independent obligation to search the record for evidence that would enable a party's claims to survive summary judgment.").

#### b.  **Adverse Employment Action**

In determining whether an employer's action is materially adverse, "Title VII's substantive provision and its antiretaliation provision are not coterminous." *Burlington N. & Santa Fe Ry.*, 548 U.S. at 67; *see id.* at 64 ("Thus, purpose reinforces what language already indicates, namely, that the antiretaliation provision, unlike the substantive provision, is not

limited to discriminatory actions that affect the terms and conditions of employment."). In the retaliation context, courts apply a "reasonable worker" standard. *Foster v. Michigan*, 573 F. App'x 377, 395 (6th Cir. 2014). That is, "an adverse action is material if it would dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*; *see Michael v. Caterpillar Fin. Servs.*, 496 F.3d 584, 594 (6th Cir. 2007) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."). Defendant contends that none of the remaining employment actions qualifies as materially adverse in the context of a retaliation claim.

The Court agrees. Although Plaintiff interpreted her superiors' delivery of her service pin as rude, Title VII "does not set forth a general civility code for the American workplace." *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68 (quotation omitted). Similarly, the change in Plaintiff's work schedule—without any loss of pay or benefits—was not materially adverse. *See, e.g.*, *Keeling v. Horizons Youth Servs., L.C.*, No. CIV.A. 3:10-23-DCR, 2011 WL 2633530, at *5 (E.D. Ky. July 5, 2011). In addition, because Plaintiff "presents no evidence to suggest that the" training she sought "would have resulted in tangible employment benefits," the parties' disagreement about the DX line does not affect this case. *Finley v. City of Trotwood*, 503 F. App'x 449, 454 (6th Cir. 2012). Finally, none of the disciplinary actions Plaintiff faced— corrective counseling, a written reprimand, and a one-day suspension with pay—rise to the level of materially adverse. *See Russell v. Ohio Dep't of Admin. Servs.*, 302 F. App'x 386, 394 (6th Cir. 2008) ("[T]he act of filing an EEOC claim does not immunize [a plaintiff] from all negative feedback in her workplace."); *Taylor*, 703 F.3d at 338 (written reprimand not an adverse

employment action in support of retaliation claim); *Terry v. Donahoe*, No. 1:12CV393, 2014 WL 1302603, at *5 (S.D. Ohio Mar. 31, 2014) ("[S]uspension with pay is not an adverse employment action.").

### c. Causation

"Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quotations omitted). "Here that means that [Plaintiff] must present evidence from which a reasonable jury could find that" she would not have been the subject of the employment actions at issue "if she had not made her charge[s]." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015). Plaintiff presents no evidence to this effect. As Defendant rightly notes, the only argument she could make on this count would be that a number of employment actions came at some point after she filed her EEOC charges. But, as Defendant also argues, "temporal proximity itself is insufficient to find a causal connection" in support of a Title VII retaliation claim, and Plaintiff's claim therefore does not survive summary judgment. *Michael*, 496 F.3d at 596.

### d. Pretext

Finally, Plaintiff makes no arguments, and offers no evidence, that Defendant's legitimate, non-discriminatory reasons for the employment actions at issue were pretext for retaliation. For this reason, she cannot show that "(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action." *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 545 (6th Cir. 2008). She therefore cannot demonstrate pretext, and her retaliation claim fails.

### *3. Conclusion*

Plaintiff has failed to demonstrate that Defendant had knowledge of her protected activity, cannot show that any of the actions taken were adverse, has not put forth evidence to show causation between the adverse actions and her protected activity, and failed to show pretext.  Defendant's motion for summary judgment is thus granted as to Plaintiff's Title VII retaliation claim.

## IV. CONCLUSION

For the reasons stated, Defendant's motion for summary judgment is **GRANTED**.  (Doc. 27).  This action is **DISMISSED**, and the Clerk is **DIRECTED** to enter final judgment.

IT IS SO ORDERED.


Date: October 11, 2016                     /s/ Kimberly A. Jolson
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE